**NEW YORK LIFE INSURANCE COMPANY, a corporation, Appellant,**

v.

**Mary Ann ATKINSON, Appellee.**

**No. 5457.**

United States Court of Appeals
Tenth Circuit.

Feb. 3, 1957.

Erl H. Ellis, Denver, Colo. (Grant, Shafroth & Toll, Denver, Colo., was with him on the brief), for appellant.

Maurice Reuler, Denver, Colo. (Thomas Kellogg, Denver, Colo., was with him on the brief), for appellee.

Before BRATTON, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

BRATTON, Chief Judge.

The substance of the ultimate question presented for determination is whether at the time of his death an insured was a member of the crew of an airplane in which he was riding, within the purview of a crucial provision in a policy of life insurance.

The face of the policy was paid. Payment under the double indemnity provision was refused. The named beneficiary instituted the action to recover under such provision. The policy expressly excluded from such provision liability if the death of the insured resulted from "service, travel or flight in any kind of aircraft * * * while the insured is participating in aviation training in such aircraft or is a pilot, officer or other member of the crew of such aircraft; * * *" The defense interposed was that the death of the insured occurred while he was riding in an airplane as a member of the crew and therefore no liability accrued under the double indemnity provision.

The cause was submitted to the trial court upon an agreed statement of facts and motions for summary judgment. These facts among others were included in the agreed statement. Colorado Exploration Company, with headquarters at Golden, Colorado, and with field offices at various other places, employed three graduates of the Colorado School of Mines as professional geologists. Warren J. Mason, Richard Harold Hurst, and the insured were the persons employed. The insured was first employed about June 1, and the other two were first employed about November 1, 1953. Prior to about July 22, 1953, the insured was with a ground group doing seismograph work in connection with the exploring for oil. In the early part of 1955, Colorado Exploration Company contracted to explore for uranium and other metals in a certain area in Wyoming. The exploration was to be done by aerial surveys with scintillometer readings and by ground studies. The air survey work was done by use of a cabin, tandem-seated dual control Piper Super-Cub owned by the company, with an aerial scintillometer installed and permanently mounted in the observer's or rear seat, inside the cabin. The rear-seat control was not operative when the aircraft was used in exploration work. The occupants of the aircraft were commonly called the pilot and the observer. It was the observer's duty to operate the scintillometer. The work began about June 1, 1955. Hurst was the pilot and Mason was the observer. Mason resigned his employment in July; the insured was assigned as observer; and he continued such work until the time of his death. The normal operation of the aerial survey work was that the pilot and the observer studied maps and planned together overnight the general area and flight plan for the next day. They agreed upon landmarks to be used to locate their planned work. The flight plan was followed to the extent that it was possible to do so on account of weather conditions. The duties of the pilot were to operate and fly the aircraft, while the duties of the observer were to watch and operate the scintillometer which had a pointer to indicate reactions to radioactive materials, and to record such reactions on a roll. The rolls were delivered every few days to the company. All of the flights were made by flying about seventy-five feet above the ground and over a pattern or grid which would cover a chosen section of land, by a number of parallel lines, usually about one hundred and fifty feet apart. From one to two sections of land were explored in a day. The flight plan was sometimes varied during the flight if some special reading was noted by the observer on the scintillometer indicating the possibility of the presence of ore,

such indication being reported by the observer to the pilot. Then intensive flying was done over the suspected area. Hurst was always the pilot of the plane. The insured was a qualified flier for ordinary flying, but was not qualified or licensed to fly an aircraft for this type of low-flying exploratory work. On September 22, 1955, the aircraft crashed while being operated in such exploratory work, and Hurst and the insured were killed. The court entered judgment awarding recovery under the double indemnity provision of the policy; and this appeal seasonably followed.

The judgment is challenged on the ground that the trial court erred in its conclusion of law that the word "crew" used in the double indemnity provision of the policy was ambiguous. The word does not have an absolutely unvarying legal significance. In general use in connection with rights arising out of the operation of water borne craft, the word "crew" is and the words "member of a crew" or "member of the crew" are ordinarily construed to comprehend the complement of persons on board a ship or other vessel rendering service in furtherance of the main object of the enterprise, without reference to the nature of the arrangement under which the service is rendered. South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732; Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 430; Hawn v. American Steamship Co., 2 Cir., 107 F.2d 999; Carumbo v. Cape Cod Steamship Co., 1 Cir., 123 F.2d 991; Wilkes v. Mississippi River Sand & Gravel Co., 6 Cir., 202 F.2d 383, certiorari denied 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344; McKie v. Diamond Marine Co., 5 Cir., 204 F.2d 132; Zientek v. Reading Co., 3 Cir., 220 F.2d 183, certiorari denied 350 U.S. 846, 76 S.Ct. 55, 100 L.Ed. 754. But cases of that kind give little aid in considering the sense in which the word crew was used in the policy of insurance issued to the decedent. It is manifest that in those cases the crucial word or expression was given a broad interpretation in order to achieve the Congressional objectives in the enactment of certain statutory provisions, while here the word appears in connection with the excluding of certain persons from the scope of the double indemnity provision of the insurance coverage.

■ An insurance policy is a contract, and the rules established for the construction of written instruments apply to contracts of insurance equally with other contracts. Words or terms in an insurance policy are to be construed according to their plain, ordinary, and accepted sense in the common speech of men unless it affirmatively appears from the policy that a different or special meaning was intended. Mandles v. Guardian Life Insurance Co. of America, 10 Cir., 115 F.2d 994; Aetna Insurance Co. of Hartford, Connecticut v. Jeremiah, 10 Cir., 187 F.2d 95; Tri-State Casualty Insurance Co. v. Loper, 10 Cir., 204 F.2d 557; Eddy v. Travelers Insurance Company of Hartford, Connecticut, 10 Cir., 212 F.2d 518; Thomas v. Continental Casualty Co., 10 Cir., 225 F.2d 798. But if the terms of a policy are ambiguous, obscure, or fairly susceptible of two reasonable interpretations, one favorable to the insured and the other to the insurer, the former will be adopted. Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; Pearl Assurance Co. v. School District No. 1 in San Miguel County, Colorado, 10 Cir., 212 F. 2d 778; Pyramid Life Insurance Co. v. Masch, Colo., 299 P.2d 117. The policy issued to the decedent did not undertake to define the crucial word crew. And in the light of these guiding principles respecting the interpretation of contracts of insurance, we think the word as used in the double indemnity provision was ambiguous and therefore should be interpreted in the manner most favorable to the insured.

■ ■ The insured in this case was employed to search for uranium and other minerals. His duties were to operate the scintillometer and to record its re-

actions. The scintillometer was positioned in the airplane. But that was done solely as the fastest and most feasible means of operating the scintillometer to its fullest capacity. It had nothing whatever to do with the operation of the plane. The pilot alone operated the plane. The insured did not take any part in its operation, maintenance, or upkeep. He was not a member of the crew of the plane within the intent and meaning of the policy of insurance. Compare, Shore Fishery v. Board of Review of Unemployment Compensation Commission, 127 N.J.L. 87, 21 A.2d 634. And therefore he was not effectively excluded from the scope of the double indemnity provision contained in the policy.

The judgment is affirmed.